12 F.3d 215
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bobby G. GREGORY, Defendant-Appellant.
 No. 93-5109.
 United States Court of Appeals, Sixth Circuit.
 Dec. 15, 1993.
 
 Before: MARTIN and RYAN, Circuit Judges; and MATIA, District Judge.*
 PER CURIAM.
 
 
 1
 Bobby G. Gregory appeals his conviction for scheming to defraud and making false statements and reports to financial institutions. Gregory alleges that the United States presented insufficient evidence at trial to support a finding of guilt by the jury, that the district court's instruction on state law regarding the noting of a lien on title was misleading, and that the court erred in permitting cross examination of Gregory's character witness regarding the fact that there were charges pending against Gregory for writing bad checks. For the following reasons, we affirm the judgment of the district court.
 
 
 2
 Bobby G. Gregory bought and sold used cars in Athens, Tennessee. He financed his purchases of the cars initially through the First National Bank of Livingston, Tennessee, and later through the Citizens National Bank of Athens as well. Gregory had no floor plan agreement with either bank, pursuant to which he would have returned to the lender a certain percentage of the moneys from each car sale, but rather executed short-term notes secured by specific vehicles.
 
 
 3
 Both banks followed similar procedures in making car loans to Gregory. When Gregory wanted to buy a vehicle, he gave the bank the title for the vehicle, or an application for title showing the bank as lienholder, and an insurance binder. The bank officers presumed that the applications for title they received had been filed with the county clerk's office, as such a filing is a necessary part of the title application process. There was testimony that neither bank would make car loans without either a title or a title application. When Gregory presented the bank with an application only, the bank normally received the actual title four to eight weeks later. At times, Gregory obtained loans from both First National and Citizens using the same vehicle as collateral, and without informing either bank that its loan might be subordinate to that of the other institution.
 
 
 4
 In early 1989, First National executive vice-president Rusty Robbins learned that four applications for title given to the bank by Gregory had not been filed with the county clerk's office, and that the bank had never been identified as lienholder on the vehicles. Robbins testified that absent possession of the actual title reflecting on its face First National's lienholder status, the bank did not believe its loans to be adequately secured. Although Tennessee law imposes no obligation on car dealers to title the vehicles in their inventory, Robbins did not understand Gregory, who financed only a single car at a time, to be a car dealer. After a subsequent meeting between the two men, at which Gregory insisted that he had filed the applications for title with the clerk's office, Robbins and Gregory terminated their banking relationship and Robbins called in the notes on the vehicles. Gregory paid the notes with money he borrowed from Citizens.
 
 
 5
 Prior to December 1989, Citizens vice president John Ray McKeehan similarly realized that he had made car loans to Gregory on several vehicles for which Citizens had not received titles. When applying for such loans in the past, Gregory had presented Citizens with an application for title showing Citizens as a lienholder. In this case, however, Gregory explained that he had sold the cars and used the proceeds to buy other cars. In response to McKeehan's request for proof of these transactions, Gregory provided Citizens with six applications for title for the vehicles that Gregory claimed to have purchased. Although Gregory told McKeehan that he had filed title applications for these vehicles with the county clerk, state records revealed that none of the applications had in fact been filed, nor had Citizens been identified as a lienholder. The records did show that Gregory was leasing one of the vehicles, a 1989 Lincoln TownCar owned by the Ford Motor Credit Corporation, and handling another, a 1988 Lincoln Continental, on consignment for a third-party owner.
 
 
 6
 From December 1989 through November 1990, McKeehan repeatedly asked Gregory for the titles to the six vehicles. Gregory responded that he planned to go to Nashville and check on the status of the title applications. During this period, Gregory also informed Citizens on several occasions that he had sold cars on which the bank held title. Each time, Gregory presented the bank with a copy of a check from Airport Auto Auction, and explained that he needed the title of the vehicle from the bank in order to receive the actual check from the buyer. After Gregory promised to pay his debt to the bank with the sale proceeds, the bank relinquished the title to him. Gregory never settled his obligations or returned the titles. As a result of this scheme, Citizens lost a total of $96,000.00.
 
 
 7
 On September 9, 1992, a grand jury returned an eight-count superseding indictment against Gregory. Count One charged Gregory with scheming to defraud First National Bank and Citizens Bank, in violation of 18 U.S.C. Sec. 1344. Counts Two through Eight charged Gregory with making false statements and reports to Citizens, in violation of 18 U.S.C. Sec. 1014. A jury subsequently found Gregory guilty on all eight counts. On January 11, 1993, the court sentenced Gregory to seventeen-month terms of imprisonment on each count, to be served concurrently, and three years of supervised release. The court also ordered Gregory to pay $96,507.86 in restitution to Citizens. This timely appeal followed.
 
 
 8
 Gregory raises three challenges to his conviction. First, he asserts that the government presented insufficient evidence at trial to support the guilty verdict. Gregory essentially denies any wrongdoing whatsoever in his dealings with First National. In regard to the evidence that Gregory submitted fraudulent applications for title to Citizens, Gregory claims that he submitted the applications not in an effort to prevent the bank from taking action on his debt, but rather only to provide the bank with a list of the vehicles for which he had obtained loans. He further admits to making two mistakes on the applications, concerning the leased and the consigned vehicles, but urges that because he was a car dealer at that time, Citizens could have perfected its security interest on all of the vehicles in Gregory's inventory by simply filing a UCC-1 Financing Statement. We are not persuaded.
 
 
 9
 Our standard of review on questions of sufficiency of the evidence is narrow. In criminal cases, we look only to whether after reviewing "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." United States v. Beddow, 957 F.2d 1330, 1334 (6th Cir.1992) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Indeed, even "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.' " United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) (quoting United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984)).
 
 
 10
 To establish a violation of 18 U.S.C. 1344, the government must prove either the execution of a scheme to defraud a financial institution or that a defendant obtained moneys from a financial institution by means of false or fraudulent pretenses. In defining the term "scheme to defraud" in the related context of the federal mail fraud statute, this Court has stated:
 
 
 11
 The standard is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." It is not necessary that the scheme be fraudulent on its face but the scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.
 
 
 12
 United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir.), cert. denied, 444 U.S. 994 (1979) (citations omitted). Here, the government provided ample evidence, in the form of Gregory's continuing and calculated use of fraudulent applications for title, of such a scheme. That Gregory now advances possible explanations for his conduct, and suggests that Citizens may have been able to perfect its security interest in the vehicles by a UCC-1 filing, is irrelevant. These arguments, which the jury did not credit, address neither the actual agreements between Gregory and the banks nor the sufficiency of the government's proof.
 
 
 13
 To establish a violation of 18 U.S.C. Sec. 1014, the government was required here to prove that Gregory knowingly made false statements to Citizens regarding a material fact for the purpose of influencing its decision to loan him money. At trial, the government demonstrated that Gregory submitted a false application in February 1989 in order to obtain a $30,500.00 loan secured in part by a 1986 Mercedes. In addition, the government proved that Gregory submitted six false applications in December 1989, in which he claimed to have sold the vehicles on which the bank held title and pledged the vehicles represented by the applications as security for his outstanding loans from the bank. Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that Gregory violated Section 1014.
 
 
 14
 Second, Gregory contends that the district court's instruction on state law regarding the noting of a lien on title misled the jury. In response to a request by Gregory, the court instructed the jury that, under Tennessee law, a UCC-1 Financing Statement must be filed in order to perfect a security interest in inventory. Gregory sought this instruction to support his contention that Citizens could have adequately secured its loans to Gregory by such a filing alone. Neither bank, however, filed a UCC-1 on the vehicles purchased by Gregory for resale until after his scheme collapsed, and both banks made these loans with the understanding that they would receive either valid title to the vehicles or an application for certificate of title showing the banks as lienholders. Accordingly, the court further instructed the jury that under state law if a title is issued, the lienholder must be identified on the face of the title. Gregory claims that this additional instruction was misleading. We disagree.
 
 
 15
 This court reviews jury instructions to determine whether " 'the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.' " United States v. Buckley, 934 F.2d 84, 87 (6th Cir.1991) (quoting United States v. Martin, 740 F.2d 1352, 1361 (6th Cir.1984)). Despite Gregory's insistence that at least one of the banks could have perfected its security interest in the vehicles he purchased for resale by filing a UCC-1 Financing Statement, the evidence adduced at trial demonstrated that the actual agreements between Gregory and the banks hinged on the banks' receipt of valid title or an application for certificate of title identifying that bank as lienholder. Given these agreements, the jury was required to determine Gregory's state of mind when he dealt with the banks. The court's decision to instruct the jury on the state law of certificates of title was, therefore, an essential part of a fair and adequate statement of the issues and the applicable law in this case.
 
 
 16
 Finally, Gregory's third allegation, that the district court erred in permitting cross examination of Gregory's character witness regarding the fact that there were charges pending against Gregory for writing bad checks, is without merit.
 
 
 17
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation